*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0029p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CSX TRANSPORTATION, INC.; CONSOLIDATED RAIL
CORPORATION,

*Plaintiffs-Appellants,*

No. 03-4345

*v.*

UNITED TRANSPORTATION UNION; GENERAL
COMMITTEES OF ADJUSTMENT,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 02-02394—Kathleen McDonald O'Malley, District Judge.

Argued: October 29, 2004

Decided and Filed: January 19, 2005

Before: KEITH, CLAY, and COOK, Circuit Judges.

---

## COUNSEL

**ARGUED:** Ronald M. Johnson, AKIN, GUMP, STRAUSS, HAUER & FELD, Washington, D.C., for Appellants. Clinton J. Miller, III, OFFICE OF GENERAL COUNSEL, UNITED TRANSPORTATION UNION, Cleveland, Ohio, for Appellees. **ON BRIEF:** Ronald M. Johnson, AKIN, GUMP, STRAUSS, HAUER & FELD, Washington, D.C., John B. Lewis, BAKER & HOSTETLER, Cleveland, Ohio, for Appellants. Clinton J. Miller, III, Kevin C. Brodar, OFFICE OF GENERAL COUNSEL, UNITED TRANSPORTATION UNION, Cleveland, Ohio, for Appellees.

KEITH, J., delivered the opinion of the court, in which COOK, J., joined. CLAY, J. (pp. 6-8), delivered a separate dissenting opinion.

---

## OPINION

---

DAMON J. KEITH, Circuit Judge. This case centers around a labor dispute between Plaintiffs CSX Transportation, Inc., and Consolidated Rail Corporation ("CSX and Conrail") and Defendants United Transportation Union, et al. ("UTU"). At issue is whether the district court erred in determining that the dispute, which is over the substantive scope of a national moratorium on contractual negotiations between the parties, is a "major" dispute under the terms of the Railroad

1

Labor Act ("RLA"). 45 U.S.C. § 151. Upon our review of the law and the record, we believe this matter is a "minor" dispute and must be resolved via the arbitration procedures set forth for resolving such disputes in the RLA. *Id.* §153. We therefore REVERSE the district court's determination.

## I. Background

### A. The Railway Labor Act

The RLA provides mandatory procedures for resolving disagreements between railroad companies and the unions representing their employees. 45 U.S.C. § 151(a). Under the RLA, a dispute must first be classified as either "major" or "minor" and will then be resolved in accordance with procedures set for that classification. A dispute is considered "major" if the parties are changing terms of an existing collective bargaining agreement and is considered "minor" if it is merely a dispute over the application or interpretation of provisions in existing agreements.[1] *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 302 (1989) ("*Conrail*") (citing *Elgin, J. & E.R. Co. v. Burley*, 325 U.S. 711, 723 (1945)). In a major dispute, the party who wishes to amend a bargaining agreement must serve the other party notice of an intended change. This is known as a "Section 6 notice." 45 U.S.C. § 156. If the parties are unable to reach an agreement after negotiation, either may seek mediation with the National Mediation Board ("NMB"). *Id.* § 155. Should that mediation fail, a Presidential Emergency Board may be appointed. *Id.* §160. Throughout the entire process, the existing agreement remains intact. *Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 150 (1969).

Unlike major disputes, the RLA mandates that minor disputes be handled in the company's or union's typical manner for handling claims and grievances that occur on railroad property. 45 U.S.C. § 153 First (I). If the grievance cannot be settled through those means, either party can remove the case to binding arbitration before the National Railroad Adjustment Board ("NRAB") or another agreed-upon arbitration board. *Conrail*, 491 U.S. at 303-04.

### B. Facts

Plaintiffs CSX and Conrail are two large unionized railroad companies. The train operators and support staff that they locally employ are represented by Defendants UTU. The dispute between the parties began when CSX and Conrail issued a notice of their intent to begin using "push cars" on their Northern District railway lines on March 21, 2002.[2] In response, UTU served Section 6 notices requesting, among other things, to bargain about the use of push cars to CSX and Conrail in March 2002. The Section 6 notices requested that the parties establish a rule concerning the construction, use, equipment and safety rules for "push cars," and amend the current crew policy to include more employee-friendly and safety benefits. On April 2, 2002, CSX and Conrail responded by suggesting that the issues be handled in the forthcoming national bargaining discussions, which were scheduled to be held in August of 2002. UTU declined the offer. On May 6 and July 20, 2002, the parties met to discuss the issues but did not reach an agreement. At the July meeting they collectively scheduled their next discussion for September 24, 2002, just over one month after a planned bargaining meeting between the national representatives of the union and various railroads.

---

[1]Examples of "minor" disputes are disagreements over meal allowances, *Bhd. of Maint. of Way Employees v. Burlington N. Santa Fe R.R.*, 270 F.3d 637 (8th Cir. 2001), or travel expenses, *Bhd. of Maint. of Way Employees v. Atchison, Topeka, & Santa Fe Ry. Co.*, 138 F.3d 635 (7th Cir. 1997).

[2]"Push cars" are specialized rail cars that provide a place for train workers to stand when a train without a caboose moves in reverse. Each car is equipped with handrails and platforms on which train workers stand.

At that meeting, held in August 2002, the numerous railroads represented by the National Carriers' Conference Committee, including CSX and Conrail, and the national leadership of UTU entered into a national bargaining agreement on employee compensation and benefits. The agreement contained a moratorium provision that precluded either party from seeking to change any part of the agreement, and explicitly prohibited the filing of any Section 6 notices prior to November 1, 2004. It also dismissed or settled all existing Section 6 notices "dated on or subsequent to November 1, 1999."

Because the push car issue was born of a Section 6 notice, CSX and Conrail subsequently notified UTU in writing that the moratorium barred any further discussion, despite the fact that the issue had not been discussed at the national meeting. The letter stated that if UTU disagreed with this position, the matter could then be set for handling in arbitration pursuant to Section 3 of the RLA, i.e., as a "minor" dispute. UTU disagreed with CSX and Conrail's interpretation of the moratorium and maintained that, because the push car issue and other issues that were related to their March Section 6 notice were not discussed during the August 2002 proceedings, the moratorium did not apply.

CSX and Conrail filed a complaint in the United States District Court for the Northern District of Ohio, seeking a declaratory judgment that the parties' dispute over the interpretation of the moratorium provision was a "minor" issue under the RLA and could thus be worked out in arbitration proceedings before the National Railroad Adjustment Board ("NRAB"). In granting summary judgment for UTU, the district court held that dispute over whether the moratorium provision did not bar the progression of the mediation over the Section 6 notices was a major dispute. As such, the court concluded that a dispute should be resolved via the negotiation and mediation procedures required for major disputes under the RLA. The district court denied CSX and Conrail's motion for reconsideration and CSX and Conrail filed this timely appeal.

## II. Analysis

This court reviews the district court's grant of summary judgment de novo. *Airline Prof'ls. Ass'n of the Int'l Bhd. of Teamsters, Local Union No. 1224 v. ABX Air, Inc.,* 274 F.3d 1023, 1029-1030 (6th Cir. 2001) (citations omitted). We also review de novo the district court's legal determination of whether a dispute is classified as minor or major under the RLA. *Gen. Comm. of Adjustment, United Transp. Union, W. Md. Ry. Co. v. CSX R.R. Corp.*, 893 F.2d 584, 589 (3d Cir. 1990).

Our case law dictates that if CSX and Conrail's interpretation that the moratorium provision should apply to the Section 6 notices at issue is arguably justified, then the issue should be resolved under the RLA's procedures for minor disputes. We have previously held that a dispute over whether a moratorium provision can be interpreted to bar the serving of Section 6 notices is a minor dispute within the exclusive jurisdiction of an arbitrator. *Int'l Longshoremen's Ass'n, Local 158 v. Toledo Lakefront Dock & Pellet Co.*, 776 F.2d 1341, 1344 (6th Cir. 1985) (finding that a docking company's interpretation of a moratorium to be arguably justified and therefore a minor issue).

Applying the classification test here, established by the United States Supreme Court in *Conrail*, leads us to the same conclusion. Under the *Conrail* test, a labor dispute is classified as minor when a party's assertion that its proposed action is permitted by the collective bargaining agreement is "arguably justified" by the terms of the agreement. *Conrail*, 491 U.S. at 307; s*ee also United Transp. Union v. Cuyahoga Valley Ry. Co.*, 979 F.2d 431, 434 (6th Cir. 1992) (finding that "[w]hen it is unclear whether a dispute is [minor or major], the dispute should be characterized as minor if the [party's] actions are 'arguably justified by the terms of the parties' collective-bargaining agreement"). But if, in an effort to justify its action, the party presents an "obviously insubstantial,"

or "frivolous," interpretation of the agreement, then the agreement will need to be amended in order for the party's proposed action to proceed. In such an instance, the dispute will be classified as major and the parties will enter into mediated discussions on amending the agreement as provided for under the RLA. *Conrail*, 491 U.S. at 303-04. The moving party carries a "relatively light burden" in establishing that its interpretation is arguably justified by the terms of the agreement. *Id.* at 307.

The facts of this case indicate that CSX and Conrail's argument that the moratorium should prohibit further negotiations on UTU's March 2002 Section 6 notices may not be strong, but it is arguably justified by the terms of the August 2002 national agreement. Significantly, the plain language of the August 2002 National Bargaining Agreement supports CSX and Conrail's claim. Section 2(a) of Article X expressly indicates that a purpose of the 2002 National Agreement is to settle any Section 6 notices dated on or subsequent to November 1, 1999:

> (a) The purpose of [the 2002] Agreement is to fix the general level of compensation during the period of the Agreement and is in settlement of the dispute growing out of the notices dated November 1, 1999[,] served by and on behalf of the carriers ... upon the organization signatory hereto, and the notices dated on or subsequent to November 1, 1999[,] served by the [unions] upon such carriers.

UTU's March 2002 Section 6 notices were dated "subsequent to November 1, 1999," and they were undisputedly served by the union (UTU) on the carriers (CSX and Conrail). Accordingly, Section 2(a) arguably settles the March 2002 Section 6 notices.

Further, Section 2(c) of Article X can arguably be interpreted to halt any mediation between UTU and CSX and Conrail over any outstanding Section 6 notices. It specifically can be read to indicate that discussions surrounding the March 2002 Section 6 notices should not progress and are to be considered "withdrawn" upon the enactment of the new collective bargaining agreement:

> (c) The parties to this Agreement shall not serve nor progress prior to November 1, 2004 .... any notice or proposal for changing any matter ...
>     (3) ... any pending notices which propose such matters are hereby withdrawn, except as otherwise provided in Article IV of this Agreement.

Lastly, UTU points to no language in the August 2002 national agreement, or discussions preceding the agreement, that reflect any intent to exclude their March 2002 Section 6 notices. UTU did not identify any language in the August 2002 agreement that indicated that the moratorium covered only Section 6 notices pursuant to national issues and procedures. There also is no language in the August 2002 agreement that limits the scope of the moratorium to national Section 6 notices or issues. None of UTU's arguments rested on the contract language written by the parties.

This reasoning, however, does not mean that UTU's arguments are without merit. We emphasize that we do not, as the dissent claims, "accepts Plaintiffs' claim that the 'push car' announcement and Defendant's resulting section 6 notices fall under the national moratorium provision." Dissent at 6. In fact, we believe that their argument that the moratorium should not be read to halt their ongoing discussion of the push car issue is supported by the record. The RLA, however, requires us to defer all disputes over interpretations of a collective bargaining agreement that are not "frivolous" or "obviously insubstantial" to arbitration. *Conrail*, 491 U.S. at 303. We find that CSX and Conrail's claim that the moratorium applies to bar discussion of the March 2002 Section 6 notices is arguably justified under the terms of the August 2002 collective bargaining agreement. As such, the district court exceeded its jurisdiction in evaluating their interpretation of

the moratorium provision. The dispute over the scope of the moratorium should therefore be resolved under the arbitration procedures established by the RLA.

### *CONCLUSION*

Based on the foregoing reasoning, we REVERSE the district court's decision and REMAND this case for the district court to issue a declaratory judgment that the moratorium dispute is a minor dispute subject to binding arbitration.

---

### DISSENT

---

CLAY, Circuit Judge, dissenting. Despite ambiguity in the language of the national agreement's moratorium provision, and evidence demonstrating that the dispute between the parties centers around Plaintiffs' attempt to create "a unilateral change in working conditions," *Brotherhood Railway Carmen v. Norfolk and Western Railway Co.*, 745 F.2d 370, 375 (6th Cir. 1984), the majority labels the dispute as "minor." With little or no examination of the language in the national agreement, the circumstances surrounding the dispute, or the prior dealings between the parties, the Court accepts Plaintiffs' claim that the "push car" announcement and Defendant's resulting section 6 notices fall under the national moratorium provision. Plaintiffs may have a relatively light burden in demonstrating that their construction is 'arguably justified,' however a light burden is not the same as no burden at all. Because I agree with the district court's determination that the dispute is a "major" one, I respectfully dissent.

A "major" dispute "look[s] to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past." *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723, 65 S. Ct. 1282, 86 L. Ed. 1886 (1945). Conversely, the "distinguishing feature" of a minor dispute "is that the dispute may be conclusively resolved by interpreting the existing agreement." *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 305, 109 S. Ct. 2477, 105 L. Ed. 2d 250 (1989). The majority quotes from Article X, section 2(a) of the national collective bargaining agreement ("CBA"), focusing on the "subsequent to November 1, 1999" clause. Yet, section 2(a) begins by stating that "[t]he purpose this Agreement is to *fix the general level of compensation*." (emphasis added). Nothing in section 2(a) or any other provision refers to push cars, cabooses or crew consist in Plaintiffs CSX and Conrail's Northern District. Moreover, Article X, section 2(c), which the Court alleges can be arguably interpreted to halt any mediation over the push car issues, does nothing to conclusively resolve the dispute.[1]

The national CBA is a general agreement between Defendant UTU and the National Carriers' Conference Committee on behalf of numerous railway carriers around the country. In the context of the RLA, we have previously noted that "[b]ecause collective bargaining agreements are meant to be 'generalized code[s] to govern a myriad of cases which the draftsmen cannot wholly anticipate,' the parties' prior 'practice, usage and custom' is relevant in determining the rights of the parties under the agreement." *Airline Prof'ls Ass'n v. ABX Air, Inc.*, 274 F.3d 1023, 1028 (6th Cir. 2001) (*quoting Conrail*, 491 U.S. at 311-12, 109 S. Ct. 2477). Defendant produced evidence that the parties have never negotiated crew consist or other local issues specific to individual carriers at the national level. *See, generally, Bhd. of R.R. Trainmen v. Atlantic Coast Line R.R.*, 383 F.2d 225,

---

[1]The full text of section 2(c) reads:
(c)    The parties to this Agreement shall not serve nor progress prior to November 1, 2004 (not to become effective before January 1, 2005) any notice or proposal for changing any matter contained in:

   (1)    This Agreement,
   (2)    the proposals of the parties identified in Section 2(a) of this Article, and
   (3)    Section 2(c) of Article XV of the Agreement of January 27, 1972, and any pending notices which propose such matters are hereby withdrawn, except as otherwise provided in Article IV of this Agreement.

If anything, this language undercuts Plaintiffs' construction of the national moratorium by singling out specific matters which may not be the subject of section 6 notices during the moratorium period, and which do not include the issues addressed in Defendant's March 2002 section 6 notices.

229 (D.C. Cir. 1967) ("It cannot be disputed that although the [union] and the carriers have occasionally discussed crew consist problems on a national scale, there has never been a national crew consist rule . . . The thousands of existing crew consist agreements have been negotiated at the local level.")  Defendant also introduced evidence that every other major railroad carrier in the country has its own locally handled agreement with the UTU dealing with these issues, and each local CBA has its own moratorium provision.  Not only had these issues not been bargained for at the national level, the parties here had "no such agreement" at the local level.  *Burley*, 325 U.S. at 723, 65 S. Ct. 1282.  In light of the parties prior 'practice, usage and custom,' Plaintiffs' argument that the national moratorium encompasses the local issues specific to the Northern District raised in Defendant's March 2002 section 6 notices is "obviously insubstantial" or "frivolous."

There are additional problems with the Court's analysis.  The majority cites to this Court's opinion in *International Longshoremen's Association v. Toledo Lakefront Dock & Pellet Co.,* 776 F.2d 1341, 1344 (6th Cir. 1985), for the decisive proposition that disputes over whether a moratorium provision can be interpreted to bar the serving of Section 6 notices are minor disputes.  However, *International Longshoremen's* does not stand for such a broad proposition, and this Court has never held that a disagreement over the application of a moratorium provision is automatically a minor dispute.  Rather, in *International Longshoremen's*, the Court held that certain negotiations over manning were barred by a national moratorium provision, because the manning issue was addressed in the national CBA:

> We agree that Toledo Lakefront's claim that negotiations *concerning manning* are barred by the moratorium provision of the Miami Agreement is arguably correct and the dispute, therefore, is a minor one.  Section 10 of the Miami Agreement *specifically addresses the possibility that changes in manning may be necessary* due to the technological and operational changes.

*International Longshoremen's*, 776 F.2d at 1344 (emphasis added).  An inference could be drawn from *International Longshoreman's* that where certain issues are not even implicitly addressed by an agreement, the agreement's moratorium provision does not bar negotiations on those issues.  That reasoning is also consistent with *Conrail*, in which the Supreme Court held that a prior agreement governing physical examinations, and providing for urinalysis to check for disease, could arguably encompass the carrier's subsequent decision to implement mandatory drug testing.  *Conrail*, 491 U.S. 299, 109 S. Ct. 2477.  In addition, the district court correctly found that in each of the cases cited by Plaintiffs in support of their argument that disputes over the scope of a moratorium provision are automatically "minor," either the subject matter of the CBA and the section 6 notices were arguably the same, or the moratorium explicitly barred the notices.[2]

The dispute between the parties arises out of Plaintiffs' announcement in March 2002 that they intended to institute "push cars" in their Northern District.  The resulting section 6 notices served by Defendant were in direct response to Plaintiffs' announcement, and involved issues never discussed in the context of the national CBA.  This is not a situation where Defendant's "claim is to rights accrued," but rather, a situation where Defendant seeks to secure new rights relating to previously unbargained-for issues.  *Burley*, 325 U.S. at 723, 65 S. Ct. 1282.  "[M]ajor disputes seek to create contractual rights, and minor seek to enforce them."  *Conrail*, 491 U.S. at 302, 109 S. Ct. 2477.  Because the majority reaches a contrary conclusion, I respectfully dissent.

---

[2]*See, e.g., Bhd. of Locomotive Eng'rs v. Portland Terminal R.R. Co.*, 860 F.2d 1088 (9th Cir. 1988) (unpublished decision); *St. Louis S.W. Ry. Co. v. United Transp. Union*, 646 F.2d 230 (5th Cir. 1981); *Flight Eng'rs Int'l Ass'n v. American Airlines, Inc.*, 303 F.2d 5 (5th Cir. 1962); *Burlington N., Inc. v. R.R. Yardmasters of America*, Nos. 76 C 1750, 1869 & 1937, 1976 WL 1570 (N.D. Ill. June 21, 1976)*; Southern Pacific Transp. Co. v. Bhd. of Ry., Airline and Steamship Clerks*, No. C-75-2187 SW, 1975 WL 1246 (N.D. Cal. Dec. 18, 1975).