RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0071p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────────

WHEELING & LAKE ERIE RAILWAY COMPANY,

*Plaintiff-Appellee*,

*v.*

No. 13-4356

BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN; ROBERT H. LINSEY,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:13-cv-02105—John R. Adams, District Judge.

Argued: October 7, 2014

Decided and Filed: April 20, 2015

Before: KEITH, MOORE, and STRANCH, Circuit Judges.

───────────────────

## COUNSEL

**ARGUED:** Margo Pave, ZWERDLING, PAUL, KAHN & WOLLY, P.C., Washington, D.C., for Appellants. Ronald M. Johnson, JONES DAY, Washington, D.C., for Appellee. **ON BRIEF:** Margo Pave, Michael S. Wolly, ZWERDLING, PAUL, KAHN & WOLLY, P.C., Washington, D.C., for Appellants. Ronald M. Johnson, JONES DAY, Washington, D.C., for Appellee.

───────────────────

## OPINION

───────────────────

STRANCH, Circuit Judge. We are asked to decide whether the Wheeling & Lake Erie Railway Company (the Railroad) and the Brotherhood of Locomotive Engineers and Trainmen (BLET) are engaged in a major or a minor dispute under the Railway Labor Act (RLA). The

1

district court entered a preliminary injunction barring BLET from taking any economic action against the Railroad, finding that the parties were engaged in a minor dispute. Because we determine the dispute is major, not minor, we VACATE the injunction and REMAND the case for dismissal of the Railroad's complaint.

## I. FACTS

The Railroad is a regional common carrier within the meaning of the RLA. 45 U.S.C. § 151, First. It maintains its principal offices in Brewster, Ohio, and operates 840 miles of track in the states of Ohio, Pennsylvania, West Virginia, and Maryland. BLET is an unincorporated association and labor union within the meaning of the RLA, 45 U.S.C. § 151, Sixth, and it represents locomotive engineers and trainmen, including conductors and brakemen, who work for the railroad. BLET has represented the Railroad's engineers since 1992 and its trainmen since 2004. Prior to 2004, the trainmen were represented by the United Transportation Union (UTU). After BLET replaced UTU, the union negotiator was Cole Davis, BLET's General Chairman of the BLET General Committee of Adjustment NS Northern Lines/W&LE (BLET GCA).

Central to our analysis is the "crew consist" provision found in Article I, Scope, of the Trainmen Agreement, which provides:

> (h): i. The crew consist of all assignments (regular or extra) shall consist of not less than one (1) conductor and one (1) brakeman, except as otherwise provided for under paragraph (ii) hereof. (Exceptions: No conductor or brakeman shall be called for light engines or engine changers.)
>
> ii. The Carrier may operate conductor only assignments at its own discretion. In the event a conductor works without a brakeman[,] he shall receive a special allowance of ten dollars for each complete tour of duty.
>
> iii. The Carrier is not prohibited from operating crews with a greater number of trainmen if it so desires.

R. 19 Page ID 282.

On October 9, 2003, the Railroad served a notice on UTU, pursuant to Section 6 of the RLA, 45 U.S.C. § 156, seeking to eliminate the "crew consist" provision of the Trainmen Agreement. Negotiations concerning this notice continued for several years.

During the negotiations, the Railroad insisted that the "crew consist" provision must be deleted from the Trainmen agreement so that the Railroad would not have to assign a union conductor to each train. BLET refused this proposed change. In March 2007, the Railroad finally agreed to a new Trainmen Agreement that maintained the "crew consist" provision, and that agreement, with some changes not relevant here, was ratified by the BLET membership in June 2008. The 2008 agreement presently governs the relationship of the parties, although the parties have continued to negotiate changes to the agreement since 2012.

On July 11, 2008, Joseph C. Burley, the Railroad's Director of Human Resources, sent a letter to Cole Davis of BLET stating in part:

> During this most recent round of bargaining, we were unable to reach an agreement on the operation of trains with a single person crew in limited situations despite our good faith efforts. At the request of [BLET, the Railroad] agreed to remove this topic from the bargaining table for this round with the understanding that the parties will continue to bargain over this matter in the next round of negotiations.

R. 19-1 Page ID 320. Davis promptly responded in writing that BLET was "committed . . . to the principle that railway operations cannot be conducted safely with any less than two Train/Engine Service employees on each movement and are prepared to maintain that stance throughout the course of any future rounds" of bargaining. R. 19-1 Page ID 322. Davis also corrected Burley's notion that BLET had agreed to continue bargaining over the elimination of the "crew consist" rule in future rounds of contract negotiations:

> The tentative agreement that failed ratification in 2007 was reached in March of that year after the Carrier unconditionally withdrew the issue of single person crews. When the Agreements that were ratified were being negotiated locally the Carrier attempted, unsuccessfully, to attach a side letter containing an *in futuro* commitment to bargain over single person crews during the next round of negotiations. It was only after intercession by the [National Mediation Board] and the attendance of [BLET's] National President and First Vice President at our last negotiation session in Cleveland that the Carrier withdrew its demand for the offending side letter and initialed the tentative Agreements that were ultimately ratified and are completely silent with respect to the issue of single person crews or the nature and scope of the next round of negotiations. While verbally acknowledging our statutory duty to bargain in good faith, [BLET] did not consent to any understanding in connection with, or in exchange for, the Carrier's

withdrawal of its demand for the side letter concerning future negotiations over the single person crew issue.

R. 19-1 Page ID 322–23.

On January 1, 2011, Robert H. Linsey succeeded Cole Davis as General Chairman of BLET. On March 25, 2011, Linsey sent a letter to Joseph Burley stating that he had just learned that, on March 3 and 14, the Railroad had operated trains from Brewster, Ohio without a union conductor assigned to the trains. Linsey advised Burley that BLET viewed these acts as major violations of the Trainmen Agreement. His letter stated that "[n]o less than one Conductor must be assigned to all trains without exception [and] [w]e must insist, therefore, that you take immediate[] action to preclude any repetition of such egregious violations." R. 20-2 Page ID 472. Burley and other officials of the Railroad met with Linsey and assured him that they would cease such operations.

Approximately two months later, in May 2011, Linsey learned that the Railroad had run another train without an engineer or a conductor and had instead allowed a Railroad management official and a shop employee to run the train. Linsey wrote a letter to James I. Northcraft, Vice President of Transportation for the Railroad, objecting to the action and demanding that the Railroad cease and desist its operation of trains without the required union crew. Burley responded that there were no rested engineers or conductors available to run the train. Linsey disagreed, pointing out that a rested engineer and a rested conductor were available to run the train and the Railroad acted deliberately in failing to call them. Again, Linsey demanded that the Railroad cease and desist its conduct. After further investigation into the incident, Burley admitted that the rested engineer and conductor should have moved the train because a freight car was attached to the locomotives. He suggested that the affected union employees submit time claims.

On July 25, 2011, Linsey sent a letter to Burley stating:

We appreciate your acknowledgement that there is no contractual basis for your actions and that you will undertake every effort to assure that it does not happen again. As you know, [BLET] considers the operation of any locomotive without a full crew to raise a major dispute and while we understand that sometimes mistakes are made inadvertently, future instances like this will be regarded as

violations of the Carrier's status quo obligation under the RLA and addressed accordingly.

R. 20-2 Page ID 481; R. 20 Page ID 327–28.

The following January, BLET served a Section 6 notice on the Railroad to amend the Trainmen Agreement. In March 2012, the Railroad served a Section 6 notice on BLET, seeking once again to remove the "crew consist" provision from the Scope Rule of the Trainmen Agreement.

BLET and the Railroad engaged in direct bargaining over both parties' Section 6 notices on numerous occasions without success. In August 2012, BLET asked the National Mediation Board (NMB) to appoint a mediator to assist the parties in their negotiations. The NMB assigned a mediator shortly thereafter, and the parties mediated their disputes. In March 2013, BLET asked the NMB to try to induce the parties to submit their unresolved bargaining disputes to binding arbitration. The NMB asked the Railroad for comments on BLET's proposal for arbitration.

Burley rejected the request for arbitration as premature. He acknowledged that the primary issue was the Railroad's proposal to eliminate the crew consist rule, which required the railroad to assign a union conductor to all freight trains. Because the parties' collective bargaining agreement covering locomotive engineers—the Engineer Agreement—had allowed the Railroad to operate a train manned with only an engineer since 1993, the Railroad wished to revise the Trainmen Agreement to remove the requirement that a conductor must be assigned to the trains. Burley suggested that BLET, not the Railroad, was "being intractable."

On Friday, September 13, 2013, Linsey learned that the Railroad had again operated two trains without the required complement of union employees. He called Burley that day and followed up with a letter stating that, on September 12, Lorne Dodds, Road Foreman of Engines, and Andrew Lengyal, a Trainmaster, performed a switching operation, and then Dodds alone operated another train for fifteen miles after the train's crew reached their maximum hours of service. Although Burley asserted that there were no union engineers or conductors available for these jobs, Linsey reminded him that the scope rule of the Trainmen Agreement did not allow the Railroad to operate a train without assigning a union conductor. Noting that BLET had

previously advised the Railroad in March and May of 2011 that BLET considered the Railroad's acts to constitute major violations of the Trainmen Agreement, Linsey demanded that the Railroad cease such violations. He emphasized that at least one union conductor must be assigned to all trains without exception under the scope rule of the Trainmen Agreement.

Linsey further pointed out to Burley that, on September 13, 2013, Road Foreman Dodds relieved the crew of a train and operated the train himself for a distance of twenty-three miles while Trainmaster Lengyal served "as a taxi service." At the time of the operation, four union employees were rested and available for service, but they were not called to work. Linsey concluded:

> In addition to the serious nature of these violations which, in application of the Railway Labor Act, we consider to be major violations as that term is applied, we must remind you that the matter of manning was a subject of your notices served on March 15, 2012, under Section Six of this law. Having yet to reach agreement on this issue, the mediation process has been invoked . . . which requires the parties (BLET and [the railroad]) to maintain a status quo in regards to conditions that existed prior to your service of the aforementioned notices. We consider the actions cited above to be a violation of that status quo.
>
> If you take exception to any of the facts set forth in [this letter], please contact me immediately.

R. 20-2 Page ID 483. Burley did not respond immediately. On Friday, September 20, BLET members engaged in a strike of the Railroad.

The Railroad filed suit the same day in federal court to obtain injunctive relief to end the strike. The district court granted a temporary restraining order enjoining the strike, but conditioned relief on the Railroad's agreement not to use supervisors or other management employees in place of engineers or conductors in the operation of its trains.

On October 3, Linsey received a letter from Burley explaining what took place on September 12 and 13. On those days, he explained, the train crews had reached their maximum hours of service and there were no other available engineers or trainmen. Burley quoted three provisions of the *Engineer Agreement*. The first, from the Scope Rule, stated in part that "'BLET is agreeable to Carrier officials and management providing service, without restriction, when the Carrier deems that reasonable attempts, as described in Articles 10(f) and 11(b) are

complied with, to acquire manpower are exhausted and the service is related to an emergency or is incidental or performed to expedite service.'" R. 20-2 Page ID 486 (quoting Article 1, Scope, paragraph (i) of the Engineer Agreement) (italics omitted).  The second provision stated:  "'If vacancies cannot be filled after all reasonable attempts, including utilizing all extra boards, furloughed boards, or other assignments, then qualified carrier officers may provide service to the customers['] freight which will be affected, without penalty.'"  *Id.* at 486–87 (quoting Article 10, Marking off and Reporting, paragraph (f)) (italics omitted).  The third provision stated: "'Regularly assigned locomotive engineers who are used in an emergency situation after having already performed compensation service on the day involved, will be paid for the actual time worked at time and one half rate with a minimum of two hours.'"  *Id.* at 487 (quoting Article 11, Calls, paragraph (b)) (italics omitted).  Management employees were used to move the trains on September 12 and 13, Burley explained, because the tracks were blocked and service to customers was delayed.  He relied on the quoted sections of the Engineer Agreement to justify the Railroad's use of management employees to serve as engineers to move the trains.  He also noted that "[t]he Trainmen Agreement is silent on this issue," and contended that, absent specific language, the Railroad retained management authority to run trains without union employees. Burley further explained that, while there were no union employees available for service on September 12, there were four union employees available for service on September 13, but they were not called because they were needed for trains scheduled later that day.  If BLET objected to the use of management personnel to move the trains, Burley thought the appropriate remedy was for those employees who believed they should have been called to work to submit a time claim to the Railroad.  Burley also explained that Lengyel was assigned as the conductor on the train and performed conductor work while operating a motor vehicle shadowing the train, a practice Burley said is common in the industry.  In conclusion, he characterized the issue as a minor, not a major, dispute and conveyed the Railroad's position that allowing management employees to perform the work was not a violation of the status quo.

In documents filed with the district court, Linsey disputed Burley's position that the four employees available for service on September 13 could be "saved" for use on later trains on the basis that the collective bargaining agreements provide that a determination of employee availability must be made at the time a train is to depart.  According to Linsey, the Railroad

admitted that there were employees available, but the Railroad chose to ignore the agreements and run trains without the employees as required by the Trainmen's crew consist rule and the Engineer's availability rule.

To support its motion for a preliminary injunction, the Railroad filed the declaration of James S. Hill, Division Superintendent, who is responsible for the movement of trains. Hill was aware "of occasional circumstances" when the Railroad used supervisors to man trains when contract engineers or conductors were unavailable or already assigned to other jobs, and he gave several examples of this practice. For instance, on October 20, 2011, Hill served as an engineer and Trainmaster Hank Allender served as a conductor on a train from Hartland Yard in Collins, Ohio to provide service to a customer in Parkertown, Ohio. After completing that job, they took a taxi to Huron, Ohio to finish loading an ore train and moved that train from the dock to Shinrock, Ohio. On October 13, 2011, Allender worked as a conductor alongside a contract locomotive engineer because the contract conductor was sick and there were no other conductors available. Hill concluded that, over the last several years, management employees Lengyel, Dodds, Darren Ohler, Edward Steiner, and Jason Cowart, all of whom report to Hill, had worked as conductors and engineers on occasion as needed. Hill attached to his declaration certain documents known as "Train Sheets" to demonstrate that management personnel were used in place of contract employees when necessary.

Dodds provided a declaration stating that, on October 27, 2010, he worked as an engineer and Lengyel worked as the conductor on a train, and that he (Dodds) served as an engineer or conductor on four other occasions in 2010. Dodds also served as a conductor alongside a contract engineer on June 10, 2013, and on June 11 he worked as an engineer alongside a contract conductor. He also worked on the September 12 and 13 trains that Linsey disputed just before BLET called a strike. Similarly, Lengyel stated in his declaration that he worked as a conductor on October 27, 2010, again during the summer of 2013, and on September 12 and 13, 2013.

Linsey and Cole Davis both attested that they were unaware until the filing of the declarations of Hill, Dodds, and Lengyel that the Railroad used management personnel to move trains on all of the dates mentioned in the declarations. Because Linsey and Davis were unaware

of most of the events, they did not act on BLET's behalf to protest the actions. Due to their lack of knowledge, they also did not approve the Railroad's conduct.

Neither party presented live testimony at the preliminary injunction hearing. After hearing oral argument, the district court granted the Railroad's motion for a preliminary injunction, and later stayed the case pending this appeal. The district court found that the Railroad had met its "relatively light burden" to demonstrate a minor dispute because the Railroad's position was "arguably justified" by the lack of a restriction in the Trainmen Agreement. Because that Agreement is silent on the issue of whether the Railroad can utilize management personnel when no conductor is available, the court reasoned that the Railroad retained discretion to make management decisions as necessary when union trainmen were unavailable. The court conditioned preliminary injunctive relief on the Railroad's maintenance of the status quo.

BLET requests that we vacate the preliminary injunction on the grounds that the parties' disagreement is a major dispute under the RLA; that the Railroad's position is frivolous in light of the clear and mandatory language of the crew consist rule in the Trainmen Agreement that "all" trains "shall" include at least one conductor; and that the Railroad failed to maintain the status quo during the parties' bargaining process on this issue. Noting that the Trainmen Agreement expressly includes only one exception to the crew consist rule, which was inapplicable here, BLET contends the decision below was improper because it essentially re-wrote the crew consist rule to include another exception in the Railroad's favor—allowing use of management personnel in place of union conductors when necessary—an exception the parties did not bargain for and to which BLET did not agree. BLET also relies on the provisions of the Trainmen Agreement, specifying that it does not contain a clause like the one in the Engineer's Agreement that grants some discretion to the Railroad to use management personnel when contract engineers are not available. The Railroad argues that the district court acted appropriately in characterizing the dispute as minor, determining that BLET's strike was improper, and enjoining BLET from continuing the strike.

## II. ANALYSIS

### A. Standard of review

A district court's decision to grant a preliminary injunction under the RLA rests within that court's sound discretion. *Adams v. Fed. Express Corp.*, 547 F.2d 319, 322 (6th Cir. 1976) (citing *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 551 (1937) and other cases). We do not disturb an order of injunctive relief unless we conclude that the district court abused its discretion in issuing the order, *id.*, and a court abuses its discretion if it relies on clearly erroneous factual findings or improperly applies the law. *Smoot v. United Transp. Union*, 246 F.3d 633, 648 (6th Cir. 2001). We review *de novo* the district court's legal determination of whether a labor dispute is "major" or "minor" under the RLA. *CSX Transp., Inc. v. United Transp. Union*, 395 F.3d 365, 368 (6th Cir. 2005).

### B. Major and minor disputes under the RLA

Labor disputes in the railroad industry have traditionally fallen into two distinct categories: "disputes concerning the making of collective agreements," known as major disputes, and "disputes over grievances," known as minor disputes. *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 722 (1945). This marked categorization of disputes is established in the RLA. There, Congress created the jurisdictional authority and separate mechanisms through which efforts are to be made to resolve both types of disputes in an orderly fashion to prevent labor unrest and interruption of interstate commerce. *See* 45 U.S.C. § 151a; *Burley*, 325 U.S. at 722–23. Congress provided:

> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152, First. The RLA encourages carriers and their employees to resolve disputes "in conference between representatives designated and authorized so to confer." 45 U.S.C. § 152, Second. The mechanism to resolve each type of dispute therefore begins with negotiation, but

the procedural pathways to resolution then diverge into two separate systems depending upon whether the dispute is major or minor. *Burley*, 325 U.S. at 725. We begin with major disputes.

Major disputes rest on the authority of 45 U.S.C. § 152 Seventh and 45 U.S.C. § 156, *Consol. Rail Corp. v. Ry. Labor Exec. Ass'n*, 491 U.S. 299, 302 (1989), and relate to disagreements over the formation of collective bargaining agreements (CBAs) or efforts to procure them. *Burley*, 325 U.S. at 723. Such disputes arise where a CBA does not exist or where one of the parties seeks to change the terms of an existing CBA. *Id.* The issue in a major dispute "is not whether an existing agreement controls the controversy"; instead, the focus is on "the acquisition of rights for the future, not [the] assertion of rights claimed to have vested in the past." *Id.*

Because major disputes concern the larger "issues about which strikes ordinarily arise with the consequent interruptions of traffic the Act sought to avoid[,]" *id.* at 723–24, Congress provided that parties must engage in a lengthy process of bargaining and mediation to settle a major dispute. *Consol. Rail Corp.*, 491 U.S. at 302. The process begins when a party desiring to make a change affecting the "rates of pay, rules, or working conditions" gives thirty days' written notice to the other party of the intended change. 45 U.S.C. § 156. This written notice is known as a "Section 6 notice." Shortly after the Section 6 notice is received, the parties must designate the place and time to begin a conference between the representatives of the parties interested in the intended change. *Id.* If the parties' private negotiations are unsuccessful, then the dispute must be mediated by the parties under the auspices of the National Mediation Board (NMB). If mediation does not succeed, the parties must voluntarily accept or reject arbitration. If the major dispute continues after arbitration, the matter may finally make its way to the President's desk for possible intervention to secure a resolution of the dispute before a strike occurs that would impact the nation's transportation system. 45 U.S.C. § 160; *Burley*, 325 U.S. at 725; *Consol. Rail Corp.*, 491 U.S. at 303 n.3. Until the parties have exhausted the process Congress designed, they "are obligated to maintain the status quo, and the employer may not implement the contested change in rates of pay, rules, or working conditions." *Consol. Rail Corp.*, 491 U.S. at 302–03. A district court has subject matter jurisdiction to enjoin any violation of the status quo until the statutory mediation procedures are completed, but the party moving for

injunctive relief in federal court is not required to make the usual showing of irreparable injury. *Id.* at 303. If no agreement is reached at the completion of this process, "the parties may resort to the use of economic force." *Id.*

By contrast, minor disputes are predicated on 45 U.S.C. § 152 Sixth and 45 U.S.C. § 153 First. *Id.* A minor dispute "contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one." *Burley*, 325 U.S. at 723. The parties' dispute concerns a grievance about either "the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." *Id.* If the dispute centers on an omitted case, "the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement." *Id.* Whether the parties' dispute relates to application of a particular CBA provision in a specific situation or to application of a CBA provision to an omitted case, "the claim is to rights accrued, not merely to have new ones created for the future." *Id.* Minor disputes "inevitably appear" in executing major agreements and policies or "arise incidentally in the course of an employment." *Id.* at 724. They relate to "specific maladjustments of a detailed or individual quality. They seldom produce strikes, though in exaggerated instances they may do so." *Id.*

The RLA directs parties to negotiate a minor dispute, but if negotiation is unsuccessful, the procedural pathway set out for minor disputes requires the parties to submit the dispute to compulsory and binding arbitration before the National Railroad Adjustment Board (NRAB) or, alternatively, to an adjustment board established by the carrier and the employees. *Id.* at 724–28; *Union Pac. R.R. Co. v. Bhd. Of Locomotive Eng'rs & Trainmen*, 558 U.S. 67, 72 (2009); *Consol. Rail Corp.*, 491 U.S. at 303–04. Either type of adjustment board has exclusive jurisdiction to resolve a minor dispute. *Consol. Rail Corp.*, 491 U.S. at 304. Judicial review of any arbitration decision is limited. *Id.* Federal courts may enjoin a strike arising from a minor dispute and may condition injunctive relief on the employer's maintenance of the status quo pending Board resolution of the dispute. *Id.* Where the dispute is minor, however, the Supreme Court has never recognized "a general statutory obligation on the part of an employer to maintain the status quo pending the Board's decision." *Id.*

In *Consolidated Rail Corp.*, the Supreme Court sought to "articulate[] an explicit standard for differentiating between major and minor disputes." 491 U.S. at 302. The line drawn in *Burley* "looks to whether a claim has been made that the terms of an existing agreement either establish or refute the presence of a right to take the disputed action"; in other words, a dispute is minor if it may be "resolved by interpreting the existing agreement." *Id.* at 305. Differentiation between major and minor disputes thus becomes "a matter of pleading" by the party who initiates the dispute, but "there is danger in leaving the characterization of the dispute solely in the hands of one party." *Id.* If a party asserts a contractual basis for a claim without sincerity or on insubstantial grounds, "honoring that party's characterization would . . . undercut the prohibitions of § 2, Seventh, and § 6 of the Act against unilateral imposition of new contractual terms." *Id.* at 306 (internal quotation marks omitted). In that situation, the proper function of the statutory process for settling disputes is protected only if the court "substitute[s] its characterization for that of the claimant." *Id.* Accordingly, "[w]here an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." *Id.* at 307.

There is no such thing as a hybrid case with attributes of both major and minor disputes. *Id.* at 310. The Supreme Court rejected the union's request to recognize a hybrid case in *Consolidated Rail Corp.* because adding a third category would "aggravate the already difficult task of distinguishing between" major and minor disputes. *Id.* The Court held:

> [I]f an employer asserts a claim that the parties' agreement gives the employer the discretion to make a particular change in working conditions without prior negotiation, and if that claim is arguably justified by the terms of the parties' agreement (*i.e.*, the claim is neither obviously insubstantial or frivolous, nor made in bad faith), the employer may make the change and the courts must defer to the arbitral jurisdiction of the Board.

*Id.*

Applying this standard, the Court ruled that a dispute arising from Conrail's decision to require drug testing as part of all periodic and return-from-leave physical examinations was a minor dispute. *Id.* at 300, 311–12. Conrail had always required employees to submit to such

physical examinations, a longstanding past practice of the parties based on implied contractual terms. *Id.* Because Conrail's claim was "neither frivolous nor obviously insubstantial," the dispute fell within the exclusive jurisdiction of the Board as a minor dispute. *Id.* at 312, 320. The Court went no further than to determine that Conrail "met the light burden of persuading [the] Court that its drug-testing practice is arguably justified by the implied terms of its collective-bargaining agreement." *Id.* at 320. The Court did not reach the merits of the dispute. *Id.* at 318, 320.

With this explanation of the differences between major and minor disputes, the resolution of this appeal comes into focus.

**C.  BLET and the Railroad are engaged in a major dispute**

The Scope Rule in Article I of the Trainmen Agreement states in mandatory language that the crew for "all assignments (regular or extra) *shall* consist of not less than one (1) conductor." R. 19 Page ID 282 (emphasis added). The rule stated in the Agreement includes only one exception, related to light engines or engine changers, and the parties agree that this exception has no relevance to this case. The parties further agree that the Trainmen Agreement is silent on whether the Railroad can assign only an engineer to a train when a rested contract conductor is not available, but they do not agree on what that silence means. BLET contends that contractual silence does not alter the Agreement's express *requirement* that the Railroad assign at least one conductor to every train; this language can only refer to every train in every situation. The Railroad insists that, because the Agreement does not contain an express prohibition on using management employees if no rested conductors are available, the Railroad retains discretion to act, and particularly so if there is a past practice of similar conduct.

We conclude that BLET has the better argument. The scope rule of the Trainmen Agreement expressly requires the Railroad to assign a union conductor to every train. *See St. Louis Sw. Ry. Co. v. Bhd. of R.R. Signalmen*, 665 F.2d 987, 992 (10th Cir. 1981) ("The agreement purports to cover all of the work of the employees and apparently leaves no room for unilaterally contracting out some of the work."). To adopt the Railroad's position would undercut the clear language of the crew consist rule—which was expressly bargained by the parties years ago—without requiring the Railroad to complete the Section 6 negotiations through

which the Railroad was seeking to remove the crew consist rule from the Trainmen Agreement. By serving a Section 6 notice on the union in 2003, the Railroad acknowledged the RLA requirement that it negotiate with the union if it wishes to revise or remove the crew consist provision from the Trainmen Agreement. Disputes about the making of collective bargaining agreements are major disputes. *Burley*, 325 U.S. at 722–24. BLET characterized the issue as a major dispute in all of its written communications with Railroad officials and, importantly, the Railroad and BLET addressed the issue by following the RLA's procedures for negotiating a major dispute. *See* 45 U.S.C. § 156. When their private negotiations over the crew consist rule failed, they engaged in mediation with a NMB mediator. When that was not successful, BLET asked the NMB to encourage the Railroad to participate voluntarily in arbitration, but the Railroad refused.

The dispute is a major one because the Railroad's claim that the Trainmen Agreement allows it to man trains without union conductors is frivolous or obviously insubstantial in light of the express language of the Trainmen Agreement's scope rule. *See Consol. Rail Corp.*, 491 U.S. at 307. The arguments raised and cases cited by the Railroad are unavailing in the face of this express language.

The Railroad presents this as an issue of managerial discretion, noting that "the general framework of a collective-bargaining agreement leaves some play in the joints, permitting management some range of flexibility in responding to changed conditions." *Id.* at 309 n.7. Relying on cases in which this court has classified disputes as minor, it contends that it may decide unilaterally how to fill conductor positions when no rested conductors are available because the Trainmen Agreement is silent about that factual situation. The cited cases do not support the Railroad's position.

In *Airline Professionals Ass'n v. ABX Air, Inc.*, 274 F.3d 1023, 1029 (6th Cir. 2001) (*ABX I*), this court concluded that it was at least arguable that the implied terms of a CBA permitted ABX to unilaterally implement random employee searches. The conclusion rested on the proposition that management retains discretion except as limited by the CBA and public law. *Id.* (citing *Appalachian Reg'l Healthcare v. United Steelworkers of Am.*, 245 F.3d 601, 604–05 (6th Cir. 2001)). Under that agreement and because "ABX had, in the past, exercised unilateral

control over its employee searching policy," this court held that ABX's position was arguably justified by the implied terms of the CBA. *Id.*

By contrast, the crew consist provision of the Trainmen Agreement at issue here mandates that the Railroad must assign at least one union conductor to each train. Because the language of the scope rule is express, we need not consider any implied terms. *Cf. Airline Prof'ls Ass'n*, 274 F.3d at 1029. As a result of its promise in the Trainmen Agreement to assign a union conductor to each train, the Railroad must maintain an adequate workforce of contract conductors to fulfill the carrier's needs. Moreover, the record in this case does not support a finding that the Railroad exercised unilateral control over its conductor assignment policy in the past. The evidence confirms that the Railroad did not have unilateral control and that BLET did not acquiesce in the Railroad's attempts to assign management employees in place of union conductors. Thus, unlike ABX, the Railroad here is not arguably justified in its position due to the express language of the crew consist provision. *Cf. id.*

The later case of *Airline Professionals Ass'n v. ABX Air, Inc.*, 400 F.3d 411 (6th Cir. 2005) (*ABX II*), is more helpful to the Railroad, but that case still does not carry the day. There, the parties were engaged in contract negotiations for a successor agreement, having served Section 6 notices on each other. *Id.* at 413. During the negotiations, the union filed a grievance on behalf of a pilot who wished to return to work following disability leave without submitting to an independent medical examination (IME) requested by ABX. *Id.* Because the parties were negotiating a new contract, ABX conceded that the parties were involved in a major dispute. *Id.* at 415. This court addressed the question "whether every dispute arising under a CBA that is being renegotiated is a major dispute." *Id.* The court held that the parties' renegotiation of the CBA did not automatically require classification of the pilot's grievance as a major dispute. *Id.* Instead, the court had to determine whether the pilot's grievance was, on its facts, a major dispute. *Id.* Because the CBA contained "neither an express authorization for nor an explicit prohibition of" the IME requirement, ABX retained management prerogative to require an IME examination, and the court classified the dispute as minor. *Id.* at 416. Here, on the other hand, the crew consist provision expressly required the Railroad to assign a contract conductor to every train, and the Railroad sought to remove that very provision from the Trainmen Agreement

through Section 6 negotiations.  The facts before us are therefore distinguishable from those in *Airline Professionals Ass'n* (*ABX II*).

The Railroad contends that BLET should have resorted to the grievance procedure outlined in Article 30 of the Trainmen Agreement to pursue its dispute.  But we cannot envision how a grievance procedure could have resolved this fundamental disagreement between the Railroad and the union about retaining the scope rule in the Trainmen Agreement.  BLET did not raise a claim or grievance on behalf of a particular employee, such as in the case of discipline; BLET challenged the Railroad's complete disregard of an express provision of the Trainmen Agreement while Section 6 negotiations were in progress on that precise issue.

The Railroad relies on *CSX Transportation, Inc. v. United Transportation Union*, 395 F.3d 365 (6th Cir. 2005), but that case is also distinguishable.  There UTU's national leadership entered into a national collective bargaining agreement that included a moratorium barring either party from trying to change any part of the agreement, explicitly prohibited the filing of Section 6 notices prior to a certain date, and dismissed or settled all existing Section 6 notices issued before a certain date.  *Id.* at 368.  CSX and Conrail subsequently notified UTU that its Section 6 notice relating to a push car dispute was barred by the moratorium.  *Id.* When UTU disagreed with that interpretation of the moratorium, CSX and Conrail filed suit in federal court, arguing the dispute was minor and should be submitted to arbitration before the NRAB.  *Id.*  The district court ruled the dispute was major, but we disagreed and reversed.  *Id.* at 368, 370. Observing that the railroads' argument was not strong, we decided the railroads' position was arguably justified by the terms of the national agreement, and the case presented a minor dispute. *Id*. at 369.  Neither the contract language nor the fact pattern presented here is similar.

Having determined that BLET and the Railroad are engaged in a major dispute, we turn now to application of the RLA to the facts and issues presented.

## D.  RLA requirements for parties engaged in a major dispute

Until parties engaged in a major dispute exhaust each step of the major dispute process, they are obligated by law to maintain the status quo.  *See Consol. Rail Corp.*, 491 U.S. at 302–03; *United Transp. Union v. Cuyahoga Valley Ry. Co.*, 979 F.2d 431, 435 (6th Cir. 1992).  In

*Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union*, 396 U.S. 142, 143 (1969), the Supreme Court agreed with the union "that what must be preserved as the status quo are the actual, objective working conditions out of which the dispute arose, irrespective of whether those conditions are covered in an existing collective agreement."

In *Detroit & Toledo Shore Line,* the union and the railroad were embroiled in controversy over whether the railroad could assign employees to report for work at outlying locations some distance from where the employees had previously reported to work. *Id.* at 143–44. In the course of the controversy, the railroad notified the union that it was reviving its plan for outlying work assignments at Trenton, Michigan. *Id.* at 146. The union served a Section 6 notice on the railroad seeking to amend the agreement to forbid the railroad from making any outlying work assignments. *Id.* The parties' negotiations were fruitless and the union asked the NMB for mediation assistance but, while the mediation was pending, the railroad posted a bulletin definitely creating the disputed work assignments. *Id.* Faced with the railroad's unilateral change in working conditions, the union threatened a strike, and the railroad filed suit in district court to prevent a strike. The union counterclaimed, seeking an injunction to enforce the status quo and prohibit the railroad from establishing the outlying work assignments. *Id.* at 146–47. The district court dismissed the railroad's complaint, granted the injunction sought by the union, and restrained the railroad from establishing the challenged work assignments. *Id.* at 147. The district court held that the status quo requirement of Section 6 prohibited the railroad from taking action on outlying work assignments "even though there was nothing in the parties' collective agreement which prohibited such assignments." *Id.* Both this court and the Supreme Court affirmed the grant of the injunction in favor of the union. *Id.* at 147, 159.

The railroad in *Detroit & Toledo Shore Line* argued in the Supreme Court, much like the Railroad does here, that the purpose of the status quo provision of the RLA "is to guarantee only that existing collective agreements continue to govern the parties' rights and duties during efforts to change those agreements," and that "working conditions as expressed in an agreement shall not be altered." *Id.* at 147–48. "And since nothing in the railroad's agreement with the union precluded the railroad from altering the location of work assignments, this working condition

was not 'expressed in an agreement'" and the railroad could make the desired assignments without violating the status quo. *Id.* at 148.

The Supreme Court rejected the railroad's position as inconsistent with the language of Section 6, which states that "working conditions shall not be altered by the carrier until the controversy has been finally acted upon," 45 U.S.C. § 156, and which "speaks plainly of 'rates of pay, rules, or working conditions' without any limitation to those obligations already embodied in collective agreements." *Detroit & Toledo Shore Line R.R. Co.*, 396 U.S. at 148. The Court viewed the railroad's interpretation of Section 6 as "sharply at variance with the overall design and purpose of the Railway Labor Act." *Id.*

The RLA's status quo requirement is "central to its design. Its immediate effect is to prevent the union from striking and management from doing anything that would justify a strike." *Id.* at 150. Because one party may wish to change the status quo without undue delay, the power granted in the RLA to the other party "to preserve the status quo for a prolonged period" encourages the moving party to compromise and reach agreement without interrupting commerce. *Id.* Both parties bear an obligation "to preserve and maintain unchanged those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." *Id.* at 153. The conditions need not be covered in the existing CBA. *Id.*

Under its interpretation of the status quo requirement of the RLA, the Supreme Court found it "quite apparent" that the railroad's argument had "little merit." *Id.* Importantly for this case, the Court stated:

> [T]he mere fact that the collective agreement before us does not expressly prohibit outlying assignments would not have barred the railroad from ordering the assignments that gave rise to the present dispute if, apart from the agreement, such assignments had occurred for a sufficient period of time with the knowledge and acquiescence of the employees to become in reality a part of the actual working conditions. Here, however, the dispute over the railroad's establishment of the Trenton assignments arose at a time when actual working conditions did not include such assignments. It was therefore incumbent upon the railroad by virtue of [Section] 6 to refrain from making outlying assignments at Trenton or any other place in which there had previously been none, regardless of the fact

that the railroad was not precluded from making these assignments under the existing agreement.

*Id.* at 153–54. When the union invoked the major dispute resolution procedures of the RLA, the railroad refused to maintain the status quo and instead implemented its planned work assignments. *Id.* at 154. The Supreme Court explained how that action was at odds with the RLA: "It could hardly be expected that the union would sit idly by as the railroad rushed to accomplish the very result the union was seeking to prohibit by agreement. The union undoubtedly felt it could resort to self-help if the railroad could, and, not unreasonably, it threatened to strike." *Id.* The central goal of the RLA "came very close to being defeated" because "the railroad prematurely resorted to self-help." *Id.* "If the railroad is free at this stage to take advantage of the agreement's silence and resort to self-help, the union cannot be expected to hold back its own economic weapons, including the strike." *Id.* at 155. The remedies of the RLA operate effectively only if both sides are equally restrained. *Id.*

Application of the status quo requirement of the RLA here means the Railroad was not free to implement at will the very change it sought to accomplish when it served the Section 6 notice on BLET. It did so anyway. The record evidence in this case demonstrates that the Railroad prematurely resorted to self-help before the conclusion of the Section 6 major dispute process. In October of 2010, again in March, June and October of 2011, and again in June and September of 2013, the Railroad unilaterally ran trains without contract conductors and used management personnel instead.

BLET officials did not know until March 2011, while the major dispute negotiations were ongoing, that the Railroad was substituting management employees for contract conductors. When BLET officials learned this information, they immediately and repeatedly protested and did not acquiesce in the Railroad's conduct. Although the Railroad assured BLET officials that it would stop the offending conduct, the Railroad continued to utilize management personnel to fill conductor positions. Under *Detroit & Toledo Shore Line*, the Railroad could not act unilaterally in violation of the RLA's status quo provisions. *See Ill. Cent. R.R. Co. v. Bhd. of Locomotive Eng'rs*, 422 F.2d 593, 596 (7th Cir. 1970) (observing that railroad could not "change existing conditions of work unilaterally and stake its status quo claim at the point gained by unilateral action"). The Railroad was obligated to maintain the working conditions the Trainmen

Agreement required—the assignment of at least one contract conductor to each train—until the parties concluded the RLA's major dispute process. Instead, the Railroad implemented the changes it sought and violated the status quo.

### III. CONCLUSION

The Railroad failed to carry its burden to show that its position was arguably justified by the terms of the parties' collective-bargaining agreement. The Railroad's claim that the Trainmen Agreement allowed it to man trains without union conductors is frivolous or obviously insubstantial, and the dispute is major. *See Consol. Rail Corp.*, 491 U.S. at 307. The status quo requirements of the RLA were violated when the Railroad prematurely and unilaterally resorted to self-help. *See Detroit & Toledo Shore Line R.R. Co.*, 396 U.S. at 155.

The district court erred as a matter of law by characterizing the dispute between the parties as minor and by granting injunctive relief in favor of the Railroad. While it appears that the Railroad's violation of the status quo might well have justified injunctive relief in BLET's favor, BLET did not file a counterclaim seeking injunctive relief. Accordingly, we VACATE the injunction in favor of the Railroad and REMAND the case with an instruction for the district court to dismiss the Railroad's complaint.