RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0152p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

FLIGHT OPTIONS, LLC; FLEXJET, LLC; ONESKY FLIGHT, LLC; FLIGHT OPTIONS HOLDING I, INC.,
  *Plaintiffs/Counter-Defendants-Appellants*,

  *v.*

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 1108; INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION,
  *Defendants/Counter-Claimants-Appellees*.

No. 16-3606

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:16-cv-00732—James S. Gwin, District Judge.

Argued: February 1, 2017

Decided and Filed: July 17, 2017

Before: COLE, Chief Judge; COOK and WHITE, Circuit Judges.

---

### COUNSEL

**ARGUED:** W. Chris Harrison, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Memphis, Tennessee, for Appellants. James Petroff, BARKAN MEIZLISH, LLP, Columbus, Ohio, for Appellees. **ON BRIEF:** W. Chris Harrison, Audrey M. Calkins, Zachary W. Hoyt, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Memphis, Tennessee, for Appellants. James Petroff, Trent R. Taylor, BARKAN MEIZLISH, LLP, Columbus, Ohio, Nicolas M. Manicone, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, Washington, D.C., for Appellees.

---

**OPINION**

---

HELENE N. WHITE, Circuit Judge.  This action under the Railway Labor Act (RLA) concerns the merger of two airlines—an acquiring airline with unionized pilots and an acquired airline with newly unionized pilots—and their efforts to bring both groups under a new, joint collective-bargaining agreement.  The airlines and their pilots' union dispute whether the creation of an integrated seniority list (ISL) of pilots is exclusively committed to the union, or whether it is subject to collective bargaining with the airlines.  The union asks us to find this disagreement to be a "major" dispute under the RLA and to affirm the district court's preliminary injunction ordering the airlines to accept the ISL proffered to them by the union.  The airlines ask us to find this dispute to be "minor" and subject to exclusive arbitral jurisdiction, and to vacate the preliminary injunction.  The airlines assert the right not to accept a union-proffered seniority list and instead to participate in the seniority-integration process through collective bargaining.  Because this assertion is not arguably justified by the parties' existing collective-bargaining agreement, the dispute is major, leading us to **AFFIRM** in part and **VACATE** in part.[1]

**I**

The International Brotherhood of Teamsters, Airline Division (Teamsters) and its Local 1108 (together, the Union) represent the pilots of Flight Options, LLC (Flight Options) and Flexjet, LLC (Flexjet, and together with Flight Options, the Carriers), two merged airlines that offer fractional ownership of jet aircraft.  Flight Options and its pilots have had a collective-bargaining agreement since 2010 (the 2010 CBA), while Flexjet's pilots are newly unionized and are not yet party to a CBA.

---

[1]The parties' dispute over voluntary-separation programs (VSPs) was initially an issue on appeal. After oral argument, the parties settled the issue and stipulated to an order dismissing with prejudice the claims related to it.  Because this issue is now moot, we will not discuss it further.  *See Int'l Union, United Auto., Aerospace, Agr. & Implement Workers of America v. Dana Corp.*, 697 F.2d 718, 721 (6th Cir. 1983) ("We cannot reach the merits of this appeal unless we find that the parties' Settlement Agreement did not render the case moot. Generally, the settlement of a dispute between the parties does render the case moot.").

Flight Options is based in Cleveland, Ohio, and is a "carrier" for purposes of the RLA. *See* 45 U.S.C. § 181. Michael Silvestro (Silvestro) is CEO of Flight Options and Kenneth Ricci (Ricci) is chairman of Flight Options and its parents. Fight Options has approximately 360 pilots who are represented by the Union and operate under the 2010 CBA.

Flexjet, another "carrier" under the RLA, has approximately 340 pilots and was acquired in December 2013 by a Flight Options parent. Prior to the acquisition, Flexjet's pilots were at-will employees. On September 30, 2015, the National Mediation Board (NMB) found that Flight Options and Flexjet were a single transportation system for purposes of labor representation under the RLA. 42 N.M.B. 174, 181 (2015). On December 15, 2015, the Union was certified after an election as the representative of the combined Flight Options and Flexjet pilot groups.[2] Silvestro and Ricci serve as CEO and chairman at Flexjet, too.

Although the Union was elected to represent the Flexjet pilots, these pilots are not yet parties to the 2010 CBA (or a successor joint CBA). Section 1.5 of the 2010 CBA governs the integration of pilots from an acquired airline; parent entities of Flight Options agreed to be bound by Section 1 of the 2010 CBA on behalf of themselves and their successors.

On appeal, the parties dispute whether the integration of the pilot groups' seniority lists[3] is solely a Union matter (in which case, the Carriers must accept the list the Union proffers) or whether the Carriers should have been allowed to participate in negotiating the list.

Section 1.5(c)(1) of the 2010 CBA governs the creation of the ISL when Flight Options acquires another carrier:

> If Pilots of the acquired carrier are hired by the Company, the seniority lists of the respective Pilot groups shall be integrated pursuant to Teamsters Merger Policy if both groups are represented by the [Teamsters], or if the Pilots of the acquired airline are not represented by the [Teamsters], then pursuant to Sections 3 and 13

---

[2]Flight Options pilots elect a master executive council within Local 1108. Flexjet pilots are not yet eligible to elect their own master executive council because a majority of them are not yet members in good standing of the Union. Until the Flexjet pilots achieve this threshold, they are represented by the Flexjet Pilots Leadership Council, which is appointed by the Local 1108 executive board as an analog of a master executive council.

[3]A pilot's seniority determines his or her "promotion and demotion, retention in case of reduction in force, recall after furlough, choice of vacancies, choice of vacation and schedule bidding . . . ." 2010 CBA § 5.1, R. 8-2, PID 108.

of the Allegheny-Mohawk Labor Protective Provisions.  Seniority integration procedures shall be promptly initiated following announcement of an operational merger affecting the seniority of the pilot groups.  The Company or other Successor, as appropriate, shall accept the integrated seniority list.  There shall be no system flush or removal of Pilots from their positions as a result of seniority list integration.

2010 CBA, R. 8-2, PID 89.[4]

Under this provision, there are two mutually exclusive processes for creating an ISL depending on whether the Union represents both the Flight Options pilots *and* the acquired pilot group, or only the former.  If both pilot groups are represented by the Union, the ISL is created "pursuant to Teamsters Merger Policy," and the Carriers "shall accept the [ISL]."  *Id.* Otherwise, the ISL is created "pursuant to Section 3 and 13 of the Allegheny-Mohawk Labor Protective Provisions," and again, the Carriers "shall accept the [ISL]" that results from that process.  *Id.*

---

[4]The McCaskill-Bond Amendment (McCaskill-Bond) to the Federal Aviation Act of 1958 regarding craft or class integration between two air carriers, 49 U.S.C. § 42112 n.(a), incorporates by reference the Allegheny-Mohawk Labor Protective Provisions (Allegheny-Mohawk), 59 C.A.B. 20 (1972):

> Section 3. Insofar as the merger affects the seniority rights of the carriers' employees, provisions shall be made for the integration of seniority lists in a fair and equitable manner, including, where applicable, agreement through collective bargaining between the carriers and the representatives of the employees affected.  In the event of failure to agree, the dispute may be submitted by either party for adjustment in accordance with section 13. *Id.* at 45.

> . . . . Section 13. (a) In the event that any dispute or controversy (except as to matters arising under section 9) arises with respect to the protections provided herein which cannot be settled by the parties within 20 days after the controversy arises, it may be referred by any party to an arbitrator selected from a panel of seven names furnished by the National Mediation Board for consideration and determination. . . . The decision of the arbitrator shall be final and binding on the parties.

> (b) The above condition shall not apply if the parties by mutual agreement determine that an alternative method for dispute settlement or an alternative procedure for selection of an arbitrator is appropriate in their particular dispute. No party shall be excused from complying with the above condition by reason of having suggested an alternative method or procedure unless and until that alternative method or procedure shall have been agreed to by all the parties. *Id.* at 49.

Ricci summed up the process in a presentation he made to the pilots:

If [the Flexjet pilots vote to be represented by the Union], then the Union's first job will be to integrate the seniority lists. That's – that's what they do.

If there is no Union, then it will fall upon management to integrate the seniority lists. So I understand why many people want to know when it is going to happen, but I'm the last guy that gets to do it.

D. Ct. Tr., R. 43, PID 1063.

Soon after it was elected to represent the acquired pilot group, the Union appointed the Flight Options Merger Committee (FOMC) and the Flexjet Merger Committee (FXMC)—two autonomous committees each comprised of three pilots from their respective groups—and charged them with the task of creating an ISL. Laddie Hostalek, business agent for Local 1108 and a Flight Options pilot, testified that the members of the FOMC were appointed by the Flight Options Master Executive Council and the members of the FXMC were appointed by the Flexjet Pilots Leadership Council.

Adam Fine, a Flexjet pilot and chairman of the FXMC, testified regarding the work of the two merger committees. According to Fine, in order to create a fair and equitable ISL, the committees reviewed precedent airline mergers and considered draft lists based on different seniority-calculation methodologies; they also conducted statistical analyses of the impact of different methodologies on pilot subgroups. After evaluating the results, the committees determined that given the different founding dates of Flight Options and Flexjet, a date-of-hire methodology would place half the Flexjet pilots at the "extreme bottom" of the ISL. D. Ct. Tr., R. 43, PID 1159–60. They instead unanimously adopted an ISL based on longevity, which they believed would be fair and equitable to both groups.[5]

The Union proffered the ISL to Silvestro on February 24, 2016, stating that it was unanimously adopted by the merger committees and requesting confirmation of its acceptance

---

[5]They defined longevity as the time spent working for the individual airline, excluding time on furlough or personal leave-of-absence status. The ISL maintained absolute seniority within the two pilot groups, i.e., if the ISL were again split between Flight Options and Flexjet pilots, the pilots would all fall in the same order of seniority as before the integration. Thus, the practical effect of the longevity approach was that pilots who worked for both airlines and had accrued seniority with both were not permitted to add their service together to move ahead of other pilots within their group. All of the top thirty positions on the ISL were held by Flexjet pilots.

pursuant to Section 1.5(c)(1) of the 2010 CBA.  Two days later, Silvestro rejected the ISL by letter, asserting that for the ISL process to comply with McCaskill-Bond, the Flexjet pilots must select their own negotiators and the Carriers "must be included to insure the process is fair and equitable."[6]  Verified Counterclaim, R. 6, PID 446–47.  Silvestro's letter further justified the rejection by arguing that the ISL appeared to be "quickly put together," that the Union lacked a Teamsters merger policy to govern the process, and that pilots who had taken leaves of absence from Flight Options to fly for Flexjet appeared to be adversely targeted by the longevity-based calculation method.[7]  *Id.* at PID 447.

The Union sent Silvestro a separate notice, also dated February 24, 2016, invoking Section 6 of the RLA to begin negotiations for a new, joint CBA.[8]  Silvestro's February 26 response rejecting the ISL proffered by the Union also stated that, in accordance with Section 1.5(c)(4) of the 2010 CBA, joint CBA negotiations would not begin until an ISL is finalized.

---

[6]Silvestro's February 26 letter was not the first time the Union heard that the Carriers desired to be involved in the ISL process.  Prior to the election, the Carriers wrote to the Union stating that after its certification as representative of both pilot groups, the ISL process would need to include negotiations with the Carriers in order for the outcome to comply with Section 1.5(c)(1) of the 2010 CBA and McCaskill-Bond.  After the certification and the formation of the FOMC and FXMC, the Carriers twice complained, to no avail, about being excluded from the Union's ISL process, warning that they would not "sit by and accept whatever list is given to them by the [Union]. . . ."  Undated Lett., R. 13-7, PID 705.

[7]These pilots were allowed to choose between being treated as a Flight Options or a Flexjet pilot for purposes of seniority calculation, but they did not receive credit for both.

[8]Section 6 of the RLA establishes a procedure to cause carriers and their unions to make and maintain agreements and to avoid disruptions to interstate commerce.  It provides:

> Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice.  In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, *rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon*, as required by section 155 of this title, by the Mediation Board, *unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board*.  45 U.S.C § 156 (emphases added).

The Union responded by filing a class-action grievance against the Carriers under Section 1.9 of the 2010 CBA,[9] and by invoking arbitration under McCaskill-Bond[10] to resolve the ISL dispute. A week and a half after the Union filed its grievance, the Carriers filed the instant action seeking a declaratory judgment that the Union's ISL process violated McCaskill-Bond because the Union must collectively bargain with the Carriers for a fair and equitable ISL, and because Flexjet pilots are "entitled to their own representative." Verified Complaint, R. 1, PID 13.

The Carriers also sought a preliminary injunction to restrain the Union from attempting to enforce the ISL it created, and from further pursuing arbitration regarding the ISL, until it negotiates the list with the Carriers. The Carriers argued that under McCaskill-Bond, they are entitled and obligated to negotiate with the Union over the ISL to ensure the list is "fair and equitable." The Carriers specifically argued that the ISL proffered by the Union, with its longevity-based seniority calculation, is not "fair and equitable" to Flight Options pilots who took leaves of absence to fly for Flexjet, and further that the Flexjet pilots were inadequately represented because the FXMC was comprised of Flexjet pilots who were not chosen by the Flexjet pilots, but rather by the Flexjet Pilots Leadership Council, which was appointed by the Local 1108 executive board instead of being popularly chosen.

After first moving to dismiss based on Federal Rules of Civil Procedure 12(b)(1) and (6), the Union filed an answer disputing the district court's subject-matter jurisdiction on the basis that under the RLA, the Carriers' claims are "minor" disputes and thus subject to mandatory arbitration. It also asserted five counterclaims, including moving to compel arbitration under Ohio state law and the Federal Arbitration Act.

In April 2016, the Union filed a motion for preliminary injunction and temporary restraining order. After first characterizing the dispute over the ISL as minor, the Union changed its position by seeking relief ordering the Carriers to restore the status quo (i.e., to accept the

---

[9]Section 1.9 provides in relevant part:

> The parties agree to arbitrate any grievance filed by the Union . . . alleging a violation of Section 1 on an expedited basis. Any such grievance shall proceed directly to the System Board of Adjustment sitting with a neutral arbitrator acceptable to both parties. . . . 2010 CBA § 1.9(a), R. 8-2, PID 93.

[10]See note 4 and accompanying text.

ISL), a remedy available only in major disputes.[11]  It also sought an order to arbitrate, a right provided by the 2010 CBA.[12]  At the motion hearing, the district court pressed the Carriers on why they believe they must participate in the seniority-integration process; they responded that they could be sued if the ISL is not "fair and equitable" as required by McCaskill-Bond.  They asserted that the Union's process was ad hoc and its longevity method was unfair to the pilots who split their time between the two carriers, taking leaves from Flight Options to fly for Flexjet.  After the Carriers asserted that they have an obligation under McCaskill-Bond to ensure a "fair and equitable" integration, the district court asked counsel why that would be when it is the Union—whose autonomous merger committees negotiated the ISL—that owes a duty of fair representation to its members,[13] while the Carriers do not.  In response, the Carriers again argued that they have an obligation under McCaskill-Bond to ensure a "fair and equitable" integration, and that they could be sued by pilots for failing to uphold this statutory obligation.  They did not allege, however, that any pilot complained that the Union-created ISL was unfair or inequitable, or that any pilot threatened suit.  The Carriers also argued that the Union lacked a "Teamsters Merger Policy," and that accordingly, under Section 1.5(c) of the 2010 CBA, the pilot seniority integration would be conducted pursuant to Allegheny-Mohawk.  The Union responded that it followed its unwritten internal merger policy in creating the ISL, including appointing the two merger committees pursuant to the Teamsters and Local 1108 bylaws.

The district court first considered whether the ISL issue is a "major" or "minor" dispute under the RLA, concluding that it is a "major" dispute and that Section 1.5(c)(1) of the 2010 CBA obligates the Carriers to accept the Union's ISL.  The court further concluded that the FOMC/FXMC process satisfied McCaskill-Bond, noting that the committees had to balance multiple issues, including different-aged companies, previous seniority integrations, furloughs, personal leaves of absence, disparities in hiring bubbles, captain/first-officer ratios, inaccurate or

---

[11]At varying points in this matter, both parties have taken inconsistent positions on the major/minor question.

[12]See note 9 and accompanying text.

[13]*See Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 199 (1944) (establishing duty of fair representation under the RLA).  This duty applies in all contexts of union activity, including contract negotiations. *Williams v. Molpus*, 171 F.3d 360, 364–65 (6th Cir. 1999) (citation omitted), *overruled on other grounds by Chapman v. United Auto. Workers Local 1005*, 670 F.3d 677 (6th Cir. 2012) (en banc).

incomplete data, and pilots hired on the same date. Although any given seniority-calculation methodology might advantage or disadvantage individual pilots, the district court explained, neither group was systemically favored, although Flexjet pilots—who the Carriers claim received inadequate representation—generally received the higher seniority rankings.

The district court noted that the Carriers presented no authority suggesting that they owe a representational duty to their pilots, who are all represented by the Union. Considering its assessment that the Union's ISL process and resulting list were objectively fair and equitable, the district court remarked that the Carriers' resistance to accepting the ISL was "curious" in light of the 2010 CBA's "clear mandate" that the "Company or other Successor, as appropriate, shall accept the integrated seniority list." D. Ct. Tr., R. 43, PID 944 (citing 2010 CBA § 1.5(c)(1)) (internal quotation marks omitted). The district court granted the Union's motion for preliminary injunction and ordered the Carriers to accept the proffered ISL.

## II

We review the issue of subject-matter jurisdiction de novo. *Watson v. Cartee*, 817 F.3d 299, 302 (6th Cir. 2016) (citation omitted). RLA disputes fall into two jurisdictional categories, major and minor. *Elgin, J. & E.R. Co. v. Burley*, 325 U.S. 711, 723 (1945). Major disputes, predicated on Section 2, Seventh and Section 6 of the RLA, involve attempts to acquire future labor-agreement rights and carry the greatest risk for a strike. Minor disputes, predicated on Section 2, Sixth and Section 3, First (i) of the RLA, involve grievances less likely to result in a strike. *See id.* at 723–24. The core distinction between these two types of disputes is that "major disputes seek to create contractual rights, minor disputes to enforce them." *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 302 (1989) (citing *Burley*, 325 U.S. at 723).

"Major" disputes focus on "acquisition of rights for the future, not [the] assertion of rights claimed to have vested in the past," *Wheeling & Lake Erie Ry. Co. v. Bhd. of Locomotive Engineers & Trainmen*, 789 F.3d 681, 690 (6th Cir. 2015) (quoting *Burley*, 325 U.S. at 723) (alteration in original), and are subject to federal-court jurisdiction. *See Consol. Rail Corp.*, 491 U.S. at 307 (1989). They require management and labor to "undergo a lengthy process of bargaining and mediation" under Sections 5 and 6 of the RLA before resorting to economic self-

help, such as striking. *Id.* at 302–03. The statutory requirements provide an "integrated, harmonious scheme for preserving the status quo from the beginning of the major dispute through the final 30-day 'cooling-off' period."**14** *Detroit & Toledo Shore Line R. Co. v. United Transp. Union*, 396 U.S. 142, 152 (1969). The "immediate effect" of this status quo requirement is "to prevent the union from striking and management from doing anything that would justify a strike." *Id.* at 150. This means that labor and management must maintain not only the status quo under existing CBAs, but also "those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." *Id.* at 153. Federal courts' major-dispute jurisdiction proceeds from their equitable power to enforce the status quo. When courts exercise jurisdiction over major disputes, they enjoin the parties to "make and maintain agreements" and in so doing help thwart disruptions to interstate commerce. *See* 45 U.S.C. §152, First.

"Minor" disputes, in contrast, involve "interpretation or application of particular provisions of existing collective bargaining agreements," *United Transp. Union v. Cuyahoga Valley Ry. Co.*, 979 F.2d 431, 434 (6th Cir. 1992), and are committed to grievance arbitration. *See Consol. Rail Corp.*, 491 U.S. at 307. Such disputes "contemplate[] the existence of a collective agreement already concluded, or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one." *Burley*, 325 U.S. at 723.

A party to a dispute under the RLA bears a "relatively light burden" to demonstrate that a dispute is covered by an existing agreement, making it minor. *Consol. Rail Corp.*, 491 U.S. at 307 (citation and internal quotation marks omitted). "[I]f there is any doubt as to whether a dispute is major or minor a court will construe the dispute to be minor." *Airline Prof'ls Ass'n, Teamster Local Union 1224 v. ABX Air, Inc.*, 400 F.3d 411, 414–15 (6th Cir. 2005) (*ABX Air III*) (quoting *Ry. Labor Execs. Ass'n v. Norfolk & W. Ry. Co.*, 833 F.2d 700, 705 (7th Cir. 1987)). In assessing whether a dispute is major or minor, we "look[] to whether a claim has been made that the terms of an existing agreement either establish or refute the presence of a right to take the disputed action." *Consol. Rail Corp.*, 491 U.S. at 305. "Where an employer asserts a contractual

---

**14**The process begins once a party serves the other with a written "Section 6" notice setting a time and place for negotiations, the first step in obtaining a new CBA or changing an existing one.

right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement." *Id.* at 307. This presumption does not apply, however, if the contractual claim is "obviously insubstantial or frivolous, []or made in bad faith." *Id.* at 310. This follows because "[i]f a party asserts a contractual basis for a claim without sincerity or on insubstantial grounds, 'honoring that party's characterization would . . . undercut the [RLA's prohibition] against unilateral imposition of new contractual terms.'" *Wheeling*, 789 F.3d at 692 (first alteration in original, second alteration added) (quoting *Consol. Rail Corp.*, 491 U.S. at 306).

Whether to grant a preliminary injunction under the RLA is left to a district court's discretion. *Adams v. Fed. Express Corp.*, 547 F.2d 319, 322 (6th Cir. 1976) (citing *Virginia Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 551 (1937)). The maintenance of the status quo may be "enforceable by whatever appropriate means might be developed on a case-by-case basis." *Chicago & Nw. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 577 (1971). We review a district court's decision whether to grant a preliminary injunction under the RLA for an abuse of discretion, such as the improper application of governing law, the use of erroneous legal standards, or the reliance on clearly erroneous findings of fact. *See City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (citation omitted). In general, courts must examine four factors in deciding whether to grant a preliminary injunction: (1) whether the movant has demonstrated a substantial likelihood of success on the merits, (2) whether the movant will suffer irreparable injury absent injunction, (3) whether a preliminary injunction would cause substantial harm to others, and (4) whether the public interest will be served by an injunction. *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Id.* The second factor is inapplicable in the context of an RLA dispute, because courts may "enjoin a violation of the status quo pending completion of the required [Section 6] procedures, without the customary showing of irreparable injury." *Consol. Rail Corp.*, 491 U.S. at 303.

Finally, as with any contract, we interpret a collective-bargaining agreement de novo. *Salary Policy Emp. Panel v. Tennessee Valley Auth.*, 149 F.3d 485, 489 (6th Cir. 1998).

## III

### A. The Carriers' Complaint

The Carriers invoked the district court's jurisdiction by asserting that they have a statutory obligation under McCaskill-Bond and the Allegheny-Mohawk provisions it codifies that is distinct from the 2010 CBA. They argue that they have an independent obligation under McCaskill-Bond to ensure that the pilot seniority integration is "fair and equitable." The Carriers correctly note that McCaskill-Bond applies when there is a "transaction for the combination of multiple air carriers into a single air carrier," 49 U.S.C. § 42112 n.(b)(4)(A), and that generally this means that Allegheny-Mohawk applies to the pilot seniority integration. *Id.* at § 4112 n.(a). They overlook, however, that the statute also provides that when, as here, the "same collective bargaining agent represents the combining crafts or classes at each of the covered air carriers, that collective bargaining agent's internal policies regarding integration, if any, will not be affected by and will supersede the requirements" of McCaskill-Bond. *Id.* at § 42112 n.(a)(1). Further, when, as here, a CBA applies to "the terms of integration involving covered employees of a covered air carrier," those terms "shall not be affected by the requirements of [McCaskill-Bond] as to the employees covered by that [CBA], so long as those provisions allow for the protections afforded by sections 3 and 13 of the Allegheny-Mohawk provisions." *Id.* at § 42112 n.(a)(2).

Thus, as the collective-bargaining agent for the pilots of both carriers, the Union's internal policies regarding integration supersede the requirements of McCaskill-Bond. Further, because the 2010 CBA applies to the terms of the integration, it controls. Nothing in the CBA denies the protections afforded by sections 3 and 13 of Allegheny-Mohawk. Those protections are that the seniority integration must be "fair and equitable" and either section 13 or an alternative agreed-upon dispute-resolution process must be provided. In this context, the protections are afforded for the benefit of the covered employees. The requirement that the integration be "fair and equitable" is an obligation imposed by the 2010 CBA on the Union, the party to whom the 2010 CBA commits the task of creating an ISL. Further, a dispute-resolution process is provided by the expedited-grievance provision of Section 1.9 of the 2010 CBA. Thus, because the 2010 CBA commits the integration process to the Union and continues to allow

employees the protections of sections 3 and 13 of Allegheny-Mohawk, the district court properly concluded that the Carriers do not have a distinct McCaskill-Bond obligation.

## B.  The Union's Counterclaim

In its counterclaim, the Union asserts that "[b]y failing to accept the [ISL], the Carrier[s] unilaterally changed the unambiguous Section 1.5(c)(1) obligation to accept the list . . . ." Verified Counterclaim, R. 9, PID 463.  The Carriers answer that this is a minor dispute over which the courts lack jurisdiction, that their actions are consistent with the 2010 CBA, and that they do not seek to unilaterally change its terms.  As with the McCaskill-Bond issue, these disputes concern whether the creation of the ISL is committed solely to the Union, or whether the Carriers must be included in that process.  The pilot-integration provision of the 2010 CBA squarely addresses this question, an important point considering that a dispute's amenability to resolution through contractual interpretation typically renders it a minor dispute, *see Consol. Rail Corp.*, 491 U.S. at 305, over which district courts have no jurisdiction.  *See Stephens v. Ret. Income Plan for Pilots of U.S. Air, Inc.*, 464 F.3d 606, 610 (6th Cir. 2006).

When a party claims that its actions are arguably justified by an existing labor agreement, we presume the dispute is minor "unless the [party's] claims of contractual justification are so frivolous or obviously insubstantial as to indicate that it is attempting to circumvent the § 6 RLA major disputes resolution procedure."  *See Chicago & N. W. Transp. Co. v. Ry. Labor Execs. Ass'n*, 855 F.2d 1277, 1285 (7th Cir. 1988).  Here, the express terms of the 2010 CBA and the record facts call into question our usual presumption that a dispute governed by the CBA is minor.

Our decision in *Wheeling* is instructive.  In that case a railroad sought changes to its collective-bargaining agreement with the union representing its conductors and brakemen.  The agreement provided that a train crew "shall consist of not less than one (1) conductor and one (1) brakeman . . . ."  *Wheeling*, 789 F.3d at 684 (quoting the agreement).  On several occasions, despite the union's objections, the railroad ran trains without the required minimum complement of crew, and later substituted management employees for union employees.  *Id.* at 685–87.  The railroad claimed that this action was arguably justified by the CBA because the contract did not

restrict it from "run[ning] trains without union employees." *Id.* at 688. The union countered that the CBA's crew provision had a single exception (which was inapplicable to the dispute) and that the carrier attempted to add a new one—the use of management employees to run trains—that the parties had not bargained for or agreed to. *Id.* at 689. We concluded that the dispute was major because the railroad's claim that "the [CBA] allows it to man trains without union conductors is frivolous or obviously insubstantial in light of the *express language* of the [CBA]." *Id.* at 693 (emphasis added) (citing *Consol. Rail Corp.*, 491 U.S. at 307). Although the parties' "practice, usage and custom is of significance in interpreting their agreement," *Consol. Rail. Corp.*, 491 U.S. at 311 (citation and internal quotation marks omitted), in *Wheeling* we found no support in the record that there was an historical practice of management exercising the kind of discretion over crew assignments it claimed the CBA justified. *See Wheeling*, 789 F.3d at 694.

Collective-bargaining agreements may "include implied, as well as express, terms." *Consol. Rail Corp.*, 491 U.S. at 311. Because the language of the *Wheeling* CBA was express, we concluded that "we need not consider any implied terms." 789 F.3d at 694. In *ABX Air III*, however, we found that an airline's CBA arguably permitted the carrier to require a medical examination before allowing a pilot to return to work after a period of disability. 400 F.3d at 415. There, although the CBA did not expressly permit the carrier to require the examination, we found it meaningful that under the CBA the carrier retained "discretion with respect to the hiring, firing, promoting, supervising, planning, and other management functions, except as limited by the [CBA] and public law." *Id.* at 415–16 (citation and internal quotation marks omitted). We also viewed the history of the parties' prior collective bargaining, including that they considered (but did not adopt) express terms related to medical examinations, as supporting the carrier's argument that at the least its medical-examination requirement was an open question. *Id.* at 416. Because the carrier's action was not inconsistent with the CBA's express terms and given the carrier's retention of management discretion, we concluded that its claim that its action was arguably justified under the CBA was not insubstantial, obviously frivolous, or made in bad faith, and that, as a result, the dispute was minor. *Id.* at 417 (citing *Consol. Rail Corp.*, 491 U.S. at 310).

A claim is "arguably justified" if any reasonable labor arbitrator, applying appropriate principles of contract interpretation and after reviewing relevant extrinsic evidence (such as evidence of past practice), could find that the contract *does justify* a party's claimed right to take, or to refrain from taking, an action.  *Cf. Wheeling*, 789 F.3d at 692.  When no reasonable contractual interpretation, express or implied, would justify a party's claim, the dispute is major and is subject to federal courts' jurisdiction to enjoin violations of the status quo.

Neither party relies on practice, usage, or custom to impart meaning to Section 1.5(c)(1) of the 2010 CBA.  *See Consol. Rail. Corp.*, 491 U.S. at 311.  Here, the Union invokes the pilot-integration provision as follows:  the Union represents both pilot groups; the Teamsters merger policy is applicable; the Teamsters merger policy was followed; the Carriers violated the CBA by refusing to accept the Union-proffered ISL; the Union pursued expedited grievance arbitration against the Carriers, the contractual remedy for the Carriers' refusal to accept the proffered ISL; in bringing the instant action and attempting to enjoin the expedited grievance arbitration, the Carriers assert unilaterally a new right to participate in the creation of the ISL.  The Carriers invoke the provision as follows:  the Union represents both groups; the Teamsters merger policy should control the integration process; there is no Teamsters merger policy; because there is no Teamsters merger policy, the Allegheny-Mohawk process applies.

Before we characterize the ISL dispute as minor because controlled by the CBA, we must satisfy ourselves that the Carriers' assertion that the 2010 CBA requires that they be allowed to bargain collectively with the Union over the ISL is "arguably justified."  If the Carriers in actuality seek to change an existing term in the 2010 CBA, the dispute is major without regard to their own characterization of it.  *See Consol. Rail Corp.*, 491 U.S. at 310.

Section 1.5(c)(1) contemplates two mutually exclusive processes for pilot integration.  If both pilot groups are represented by the Teamsters, the Teamsters merger policy applies; if not, then the parties follow the Allegheny-Mohawk provisions, which require a fair and equitable integration process that *may* (but need not necessarily) include collective bargaining.  *See* 59 C.A.B. 20, 45 (1972).  Regardless of which of these two processes applies, the 2010 CBA expressly provides that the Carriers "shall accept" the resulting ISL.  2010 CBA § 1.5(c)(1), R. 8-2, PID 89.

In his pilot presentation, shortly after the purchase, Ricci, the Carriers' chairman, accurately described the seniority-integration process: if the Flexjet pilots elected the Union to represent them, then it would be the Union, and not management, that would put together the ISL. Neither party disputes that the Teamsters represent both pilot groups. Any reasonable labor arbitrator would find that, based on the express language of the pilot-integration provision, the creation of the ISL is committed to the Union and the Carriers' sole function with regard to it is to accept what is proffered. Because the issue is controlled by express terms that leave no ambiguity or openness to interpretation, we need not consider implied terms. *Cf. Wheeling*, 789 F.3d at 694.

The Carriers argue, however, that this process does not apply because there is no "Teamsters Merger Policy," and the contract requires the integration to be conducted pursuant to such a policy.[15] It is true that the Teamsters do not have a standalone, written document directing how pilot-seniority integrations are to be done; the Carriers rely on this fact in asserting that no merger policy exists. However, the record rebuts this assertion. The Union explained that it followed an unwritten internal merger policy, which included appointing the FOMC and FXMC pursuant to its national and local bylaws. Although the Carriers may find this policy unsatisfactory, it is not for them to say what the "Teamsters Merger Policy" should look like or provide; it is the *Teamsters'* merger policy. In any case, appointing autonomous merger committees pursuant to Union rules, and entrusting the creation of the ISL to those committees, effected a merger policy.

Although the pilot-integration provision by its nature does not affect ordinary operations, it nonetheless represents the status quo because it is what Flight Options and the Union bargained for and agreed would govern in the extraordinary case of Flight Options acquiring another airline. The Union followed the 2010 CBA's express terms and proffered an ISL to the Carriers for acceptance; the Carriers refused to accept the list, instead asserting a new, unbargained-for right to be involved in the ISL process. The Carriers may seek such a right, but

---

[15]Although Section 1.5(c)(1) of the 2010 CBA capitalizes "Teamsters Merger Policy," suggesting it is a defined term, it does not appear elsewhere in the contract.

they must undergo the Section 6 bargaining process to do so, and, in the interim, must maintain the contract's status quo.

The district court did not err in finding that the 2010 CBA does not arguably justify the Carriers' assertion that they have a right to participate in the ISL process. The dispute is thus major. The district court properly enjoined the Carriers to honor the express terms of Section 1 of the 2010 CBA. However, these express terms provide that if the Carriers refuse to accept the Union's proffered ISL, the Union may invoke an expedited grievance-arbitration process, which uniquely applies to disputes under Section 1 of the 2010 CBA.[16] *Compare* 2010 CBA § 1.9(a) (Expedited Arbitration) *with* § 20 (Grievance Procedures). This process is equally part of the contractual status quo, and it is the process that the Union sought to pursue when the Carriers started this action. The district court's contractual interpretation stopped short, finding that the contract required the Carriers to accept the proffered ISL. Although that is true, the 2010 CBA's established remedy for non-compliance is that the Carriers submit to expedited arbitration brought by the Union. Accordingly, the district court shall modify the injunction to require the Carriers to either accept the Union's proffered ISL or to submit to expedited grievance arbitration under Section 1.9 of the 2010 CBA.

## IV

The Carriers raise three additional issues on appeal.

The first issue is whether the Norris-LaGuardia Act of 1932 (NLA), 29 U.S.C. § 101, bars the issuance of a preliminary injunction because it is not the "only practical, effective means" for enforcing the Union's rights under the RLA. District courts may issue labor injunctions "when such a remedy is the only practical, effective means of enforcing the duty to exert every reasonable effort to make and maintain agreements." *See Chicago & Nw. Ry. Co.*, 402 U.S. at 583 (discussing strike injunctions). The Carriers do not identify any other "practical, effective means" of dispute resolution, however. Indeed, it is they who first availed themselves of the federal courts in lieu of grievance arbitration, invoked by the Union, which would have

---

[16]*See* note 9 and accompanying text.

directly addressed each parties' rights and obligations. Given this, the district court's grant of preliminary injunction is not inconsistent with the NLA.

The Carriers next argue that the district court misapplied the RLA by imposing its injunction on Flight Options Holdings I, Inc. and OneSky Flight, LLC, parent entities of Flight Options, as "carriers." Both of these companies are counter-defendants and indirect holding companies of Flight Options. Flight Options Holdings I, Inc. signed a side letter binding it, its affiliates (including subsidiaries and parents), and its successors to Section 1.5 of the 2010 CBA. OneSky Flight LLC's parent, Directional Aviation Capital, LLC, signed a similar letter. The district court did not erroneously classify these companies as "carriers" for RLA purposes; rather it referred to them by a collective party name based on their agreed status.

The final issue is whether the district court failed to address all four preliminary-injunction factors and failed to require the Union to post an injunction bond, and, if so, whether these failures were abuses of discretion. The Carriers argue that the district court's order should be reversed because it discusses only the movant's likelihood of success on the merits, and does not address the other preliminary-injunction factors: irreparable harm to the movant absent injunction, substantial harm to others, and the public interest. *See Overstreet*, 305 F.3d at 573 (6th Cir. 2002).

It is "generally useful for [district courts] to analyze all four of the preliminary injunction factors." *Leary v. Daeschner*, 228 F.3d 729, 739 n.3 (6th Cir. 2000). This is especially true because this court may analyze a factor differently than did the district court. *Id.* Weighing the preliminary-injunction factors is a matter of discretion, however, and here the district court did not abuse its discretion by not conducting an explicit four-factor analysis. *See In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985) ("[T]he four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met."). The preliminary-injunction order's analysis opened with a listing of the *Overstreet* factors. To the extent it did not explicitly address a factor, the court's order indirectly addresses it, or the record otherwise supports its presence. First, courts may "enjoin a violation of the status quo pending completion of the required [Section 6] procedures, without the customary showing of irreparable injury." *Consol. Rail Corp.*, 491 U.S. at 303. Second, the Carriers are unlikely to

suffer substantial harm from being required to preserve the status quo: not only are they obliged by statute to do so, but their opposition to accepting the proffered ISL is, as the district court noted, "curious" given the express language of the 2010 CBA and their lack of a discernible interest in what the final ISL looks like. *See* Op. & Order, R.33, PID 940. Further, the pilots are unlikely to be harmed by an injunction that vindicates their own union's ISL process, whose result the district court reasonably concluded was fair and equitable. Third, the public's interest in uninterrupted service from the Carriers—at least that segment of the public that relies on or benefits from their services—is protected by the maintenance of the status quo. *See Int'l Ass'n of Machinists & Aerospace Workers v. Transportes Aereos Mercantiles Pan Americandos, S.A.*, 924 F.2d 1005, 1007 (11th Cir. 1991) (explaining that the RLA is designed to prevent disruptions to interstate commerce).

The Carriers also argue that the preliminary injunction is jurisdictionally defective because the district court did not require the Union to post an injunction bond. *See* Fed. R. Civ. P. 65(c) (permitting preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained"); *see also Mich. Am. Fed'n of State Cty. & Mun. Emps. Council, Local 1640 v. Matrix Human Servs.*, 589 F.3d 851, 860 (6th Cir. 2009) (holding that "a bond is an absolute precondition of a federal court's jurisdiction over labor injunctions."). This point is moot. During the pendency of this appeal the district court ordered, and the Union posted, a $125,000 bond.

## V

For the reasons set forth above, we **AFFIRM** the district court's determination that the CBA pilot-integration provision is not in conflict with McCaskill-Bond; **AFFIRM** its determination that it had jurisdiction to order the Carriers to act in conformity with the CBA, which requires that they either accept the ISL or submit to expedited grievance arbitration; **VACATE** the preliminary injunction to the extent it permits the Carriers to do the former and removes the option to do the latter; and **REMAND** this matter to the district court for further proceedings consistent with this opinion.